USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/29/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PER MAGNE EIDEM,

              Petitioner,

-v-

DANA MARIE EIDEM,

              Respondent.

No. 18-cv-6153 (RJS)
OPINION AND ORDER

RICHARD J. SULLIVAN, Circuit Judge:

    Petitioner Per Magne Eidem ("Petitioner") brings this action pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, seeking an order directing the return of his two sons to Norway. The children are currently in the care of their mother, Dana Marie Eidem ("Respondent"), in New York. On October 9, 2018, the Court held a hearing in this matter. For the reasons set forth below, Petitioner's application for relief under the Hague Convention is GRANTED.

I. BACKGROUND

A. Findings of Fact[1]

    Petitioner is a Norwegian citizen who was born and raised in Norway. (PTO ¶ 1.) Respondent, a dual citizen of the United States and Norway, was born in Brooklyn, New York, but moved to Norway with her mother in 1993 at the age of eight. (*Id.* ¶¶ 2–3.) The parties met in 2004, moved in together in 2005, and married on June 9, 2008. (*Id.* ¶ 4; Decl. of Per Magne Eidem, dated Sept. 25, 2018 ("Pet. Decl.") ¶ 10.) The parties lived together in Elnesvågen, Norway from 2005 until 2013. (PTO ¶ 4.)

---

[1] The Court's factual findings are taken from the hearing transcript (Doc. No. 66 ("Tr.")), the evidence presented at

The parties had their first child, T.E., on August 25, 2008. (*Id.* ¶ 9.) Shortly after his birth, T.E. was diagnosed with Hirschsprung's disease, a condition wherein nerves are missing from parts of the intestine, and he underwent a "pull-through" surgery at a hospital in Trondheim to remove part of his colon. (*Id.* ¶¶ 10, 15; Decl. of Dr. Harpreet Pall, dated Sept. 26, 2018 ("Pall Decl.") ¶¶ 17–18.) The Trondheim hospital, located four hours by car from Elnesvågen, is one of two hospitals in Norway capable of performing a pull-through surgery. (PTO ¶ 11; Tr. 46:12–15.) The parties had their second child, N.E., on December 8, 2010. (PTO ¶ 12.) From a young age, N.E. has had difficulties with verbal skills. (*Id.* ¶ 13.)

On June 24, 2013, Respondent filed for separation, and the parties were legally divorced in 2014. (*Id.* ¶¶ 16, 17; Pet. Decl. ¶ 11.) Following their divorce, the parties entered into a visitation agreement providing for joint custody over the children. (PTO ¶ 19.) Specifically, the agreement explains that the children's "permanent place of abode" would be with Respondent, but that Petitioner would have custody over the children every other Wednesday and Thursday, every other weekend from Friday to Monday, and every other year for several holidays. (*Id.*) During the summer of 2016, Petitioner signed a letter of parental consent allowing Respondent to travel to the United States with the children for a one-year period. (*Id.* ¶ 21.) The parties agreed that Respondent would return the children to Norway before the beginning of the Norwegian school term in August of 2017. (Pet. Decl. ¶ 15.) Before leaving for the United States with Respondent in 2016, the children had never visited the United States or otherwise traveled outside of Norway, except to visit Sweden. (*Id.* ¶ 10.)

Petitioner came to New York to visit the children in December 2016 around Christmas. (PTO ¶ 22.) He also kept in regular contact with the children via Skype. (Pet. Decl. ¶ 21.) And as early as January of 2017, Petitioner began coordinating the children's return to Norway with

---

the hearing, and the parties' joint pre-trial order (Doc. No. 34 ("PTO")).

Respondent. (*Id.* ¶ 20.) By April of 2017, however, Respondent had decided that she was going to stay in New York with the children. (Decl. of Dana Marie Eidem, dated Sept. 26, 2018 ("R. Decl.") ¶ 79.) Nevertheless, she lied to Petitioner and told him that she had purchased airline tickets for the children to return to Norway on August 8, 2017. (Pet. Decl. ¶ 20; Tr. at 223–25.) As a result, on August 8, 2017, Petitioner went with his father to the Molde Airport to meet the children. (Pet. Decl. ¶ 20.) After the flight landed and Petitioner realized that the children were not actually on board, he reached out to Respondent, who admitted that she had lied about purchasing airline tickets and explained that she was going to keep the children in the United States. (*Id.*; Tr. at 226:20–24.) Respondent then cut off all contact between Petitioner and the children. (Pet. Decl. ¶ 21.) Although Petitioner tried calling at least a dozen times, Respondent never answered. (*Id.*; Tr. 57:14–24.)

B. Procedural History

Petitioner initiated this action on July 6, 2018 by filing a petition for the return of the children to Norway pursuant to the Hague Convention and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 9001–9011. (Doc. No. 1 (the "Petition").) Respondent filed her response *pro se* on August 6, 2018. (Doc. No. 7.) The following week, Respondent retained *pro bono* counsel from the law firm of Quinn Emanuel Urquhart & Sullivan, LLP, upon a referral from the New York Legal Assistance Group. (Doc. Nos. 15–17.)

The parties engaged in limited discovery and filed submissions in advance of an evidentiary hearing, including pretrial memoranda, affidavits, stipulations of fact, and witness declarations. (*See, e.g.*, PTO; Doc. No. 28.) The Court conducted the hearing on October 9, 2018, at which it heard testimony from Petitioner; Petitioner's Norwegian Attorney, Halvor Hjelm-Hansen; Respondent's mother, Josephine Gjendem; Dr. Roger A. Rahtz, M.D., a

3

psychiatric evaluator; Dr. Harpreet Pall, M.D., a pediatric gastroenterologist; and Respondent. Although the Court did not receive any testimony from the children and there was no other reason for the children to attend, Respondent nevertheless brought the children to the hearing.[2] (*Id.* at 7:10.) Given Respondent's history of consistently bringing the children to proceedings in this matter, the Court expressed concern that Respondent was using the children to bolster her arguments regarding the traumatic effect of the litigation on them. (*E.g., id.* at 7:13–8:11.) Respondent, however, testified that she had no choice but to bring the children to the hearing after a babysitter had unexpectedly canceled on her that morning. (*Id.* at 195:3–12.) Respondent further testified that she could provide the Court with text messages from the babysitter to corroborate her testimony. (*Id.* at 196:13–18.) The Court ordered Respondent to submit a letter supporting her assertions about the babysitter, with copies of the text messages, within the week. (*Id.* at 249:15–250:17.)

Later that week, Quinn Emanuel notified the Court of its intention to move to withdraw as Respondent's counsel. (Doc. No. 51.) The Court then held an *ex parte* hearing on October 17, 2018, at which Respondent admitted that she had perjured herself at the October 9 hearing. (Tr. of Oct. 17, 2018 Conference at 7:18–8:8.) Specifically, Respondent admitted that she had lied to the Court when she insisted that she only brought the children to the hearing because the babysitter had canceled on her at the last minute. (*See, e.g.,* Tr. at 195:1–197:1.) In fact, Respondent had never talked with a babysitter about watching the children on October 9, 2018. (Tr. of Oct. 17, 2018 Conference at 8:1–3.) In light of Respondent's false testimony and the consequent breakdown in the attorney-client relationship between Respondent and Quinn Emanuel, the Court granted Quinn Emanuel's motion to withdraw as counsel. (*See id.* at 4:3–5; Doc. No. 50.)

---

[2] A Quinn Emanuel attorney ultimately supervised the children in a side room during the hearing. (Tr. 197:2–5.)

4

Petitioner and Respondent submitted post-trial briefs on November 1, 2018 (Doc. No. 61) and November 2, 2018 (Doc. No. 62), respectively, and Petitioner filed his reply to Respondent's post-trial brief on November 9, 2018 (Doc. No. 68). On November 13, 2018, the Court held another conference at which Respondent explained that she currently does not intend to return to Norway with the children if the Court orders their return to Norway. (Tr. of Nov. 13, 2018 Conference at 19:9–24.) At that conference, the Court directed Petitioner to submit a supplemental declaration detailing his plans for the children's residence, psychiatric care, medical care, and schooling should the Court order the return of the children to Norway. (*Id.* at 10:23–12:7.) Petitioner filed his supplemental declaration on November 20, 2018. (Doc. No. 72.)

### C. Subsequent Medical Procedures

After the conclusion of post-trial briefing, the Court postponed ruling on the Petition while closely monitoring T.E.'s medical status in light of his surgeries scheduled at the end of 2018 and early 2019. To that end, the Court ordered Respondent to keep the Court apprised of T.E.'s surgery schedule and outcomes. (*See* Doc. Nos. 73, 76, 78, 81, 85, 87.)

On November 30, 2018, T.E. successfully underwent a pull-through surgery, which was performed by Dr. Jason Fisher of NYU Langone. (Doc. No. 82.) Dr. Fisher then performed a follow-up operation and examination on January 23, 2019 in which he confirmed that T.E. had fully healed from the November 2018 pull-through surgery. (*Id.*) On March 19, 2019, Dr. Fisher performed the final scheduled operation on T.E., successfully closing T.E.'s loop ileostomy. (Doc. No. 90 at 3.)

Although the surgery to close T.E.'s ileostomy went well, T.E. soon became very ill, ultimately requiring Dr. Fisher to perform an exploratory operation. (Doc. Nos. 86, 90.) Dr.

Fisher performed that operation on March 26, 2019. (Doc. No. 90 at 3.) In a letter dated March 27, 2019, Dr. Fisher reported that he found "no issues with the intestinal connection that was made as part of T.E.'s ileostomy closure" and that he was therefore able to treat T.E.'s illness. (*Id.*) Nevertheless, based on his findings, Dr. Fisher anticipated that T.E. would require "two to three rectal irrigation[s] per day . . . for several weeks to months, and potentially indefinitely." (*Id.*)

On April 2, 2019, in light of Dr. Fisher's prognosis and T.E.'s delayed recovery from the ileostomy closure, the Court ordered the parties to submit letters addressing the following issues:

> (1) whether Petitioner is able and prepared to access the specific daily treatment identified by Dr. Fisher in his March 27, 2019 letter, and if so, how Petitioner plans to do so (including any relevant housing considerations); [and] (2) when T.E. will be able to travel safely to Norway in light of his current medical status.

(Doc. No. 91 at 2.) On April 19, 2019, Petitioner submitted a declaration in which he stated that he was "preparing to bring T.E. to St. Olav[']s Hospital [in Trondheim, Norway] daily for the rectal irrigations until such time as [he] can perform same by [himself]." (Doc. No. 95 ¶ 3.) Petitioner was also in the process of "immediately obtaining temporary housing near Trondheim." (*Id.* ¶ 6.) In addition, Petitioner submitted letters from Dr. Øystein Drivenes of St. Olav's Hospital, T.E.'s "former physician specializing in Hirschsprung's Disease" (*id.* ¶ 2), who stated that T.E. would receive necessary and adequate medical care in Norway (Doc. No. 95-1 at 3; Doc. No. 97). With respect to T.E.'s ability to travel to Norway, Respondent submitted a letter from Dr. Fisher, dated April 16, 2019, stating that "T.E. is physically safe to travel by any means, but such travel cannot place any burden or restriction on the ability for him to receive daily irrigation[s]." (Doc. No. 94 at 4.)

Having carefully considered the parties' submissions regarding T.E.'s health and the adequacy of medical care in Norway, the Court is now prepared to rule on the Petition.

6

II. ANALYSIS

A. Statutory Scheme

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The Convention's express objectives are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1.

Pursuant to ICARA, the Convention's implementing legislation, an aggrieved custody claimant may file a petition in state or federal district court for the return of a child located within the court's jurisdiction. 22 U.S.C. § 9003. In order to prevail on such a claim, a petitioner must show by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005); *see* Hague Convention, art. 3. If the petitioner successfully establishes a *prima facie* case of wrongful removal or retention, the burden then shifts to the respondent to establish one of the Convention's defenses, and if the respondent fails to do so the child must be returned. *See Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999).

B. *Prima Facie* Case

Respondent argues that Petitioner has not made out a *prima facie* case of wrongful removal or retention pursuant to ICARA. Specifically, Respondent contends that the children are habitual residents of the United States, not Norway, and that Petitioner failed to properly exercise

7

his custody rights.

In *Gitter*, the Second Circuit set forth a two-part test for ascertaining a child's habitual residence pursuant to the Hague Convention:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Gitter*, 396 F.3d at 134.

Here, the last shared intent of the parties was clearly for the children to be habitual residents of Norway. Indeed, Respondent admits that, when the parties agreed that Respondent would take the children to the United States in August of 2016, their shared intent was for the children to live in the United States for one year only, and to return to Norway – where they had lived the entirety of their lives to that point – before the beginning of the Norwegian school year in August 2017. (*See, e.g.*, Tr. at 203:8–12.) Thus, the Court concludes that it was the intent of the parties for the children to be habitual residents of Norway.

Furthermore, the Court finds that the children have not so acclimatized to the United States that they have acquired a new habitual residence. A court can conclude that a "child's habitual residence has shifted to his or her new location" only under the "relatively rare circumstances in which a child's degree of acclimatization is so complete that serious harm can be expected to result from compelling his or her return to the family's intended residence." *Mota v. Castillo*, 692 F.3d 108, 116 (2d Cir. 2012) (internal quotation marks and alterations omitted). Here, the children spent the first eight and six years of their lives, respectively, in Norway.

Nearly all the children's extended family resides in Norway, including their maternal grandmother and paternal grandparents. And although the children have now lived in the United States for more than two years, "[i]t would frustrate the objectives of the Convention if a parent or guardian could secure an advantage in an anticipated custody dispute merely by whisking the child away to a foreign land, and retaining [him or] her there long enough to amass evidence of the child's acclimatization to the new location." *Id.*

Respondent has suggested that the children have so acclimatized to living in the United States that they have completely forgotten how to speak Norwegian. (*See* Tr. at 237:7–238:1.) However, the Court does not credit Respondent's testimony in light of her admitted perjury. Similarly, the Court does not credit Dr. Rahtz's testimony regarding the children's acclimatization to the United States to the extent that he relied upon Respondent's representations. (*See, e.g.*, Tr. at 171; Decl. of Dr. Roger Rahtz, dated Sept. 26, 2018 ("Rahtz Decl.") ¶ 11.) Thus, the Court has no reason to conclude that the children have so acclimatized to the United States that "serious harm can be expected to result" from compelling their return to Norway. *Castillo*, 692 F.3d at 116.

Respondent also argues that Petitioner failed to properly exercise his custody rights under the Hague Convention. "A 'person cannot fail to exercise his custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.'" *Souratgar v. Fair*, No. 12-cv-7797 (PKC), 2012 WL 6700214, at *4 (S.D.N.Y. Dec. 26, 2012) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)), *aff'd sub nom. Souratgar v. Lee*, 720 F.3d 96 (2d Cir. 2013); *see also In re D.T.J.*, 956 F. Supp. 2d 523, 532–33 (S.D.N.Y. 2013) ("The standards applied to evaluating whether a petitioner is exercising custody at the time of removal are . . . lenient: They have been held to require fairly minimal activity on the part of a

9

petitioner."). Here, the Court concludes that Petitioner exercised his custody rights under the Hague Convention by, among other things, consistently visiting the children in Norway, traveling to the United States to see them at Christmas, and paying child support through January 2017. (*See* Pet. Decl. ¶¶ 16, 19, 25; Rebut. Decl. ¶¶ 31, 42.) Even if the Court were to credit Respondent's assertion that "Petitioner often failed to exercise his visitation rights" while the children were in Norway, such delinquency is insufficient to constitute abandonment of the children. (R. Decl. ¶ 50.) Indeed, Respondent admits that the longest stretch Petitioner ever went without seeing the children – prior to Respondent taking them to the United States – was for about five weeks. (*Id.*) Furthermore, the fact that Petitioner stopped making child support payments in January 2017 – supposedly to offset payments that Respondent owed pursuant to a loan in Norway (Tr. at 49:2–10) – is similarly insufficient to constitute such abandonment. *See Krefter v. Wills*, 623 F. Supp. 2d 125, 134 (D. Mass. 2009) (holding that the petitioner did not abandon his custody rights even though he unilaterally reduced child support payments in alleged violation of a spousal agreement). Accordingly, the Court concludes that Petitioner has made out a *prima facie* case of wrongful removal and retention of the children under ICARA.

C. Grave Risk Defense

Respondent next argues that the children will be exposed to grave risk of harm if they are returned to Norway.

Pursuant to Article 13(b) of the Hague Convention, signatory States are "not bound to order the return of the child" where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Respondent bears the burden of establishing the applicability of the "grave risk" defense by clear and convincing evidence. *See* 22 U.S.C. § 9003(e)(2)(A). The

10

defense is inapplicable to "those situations where repatriation might [merely] cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences." *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001). On the other hand, the defense does apply to "those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation." *Id.*

As an initial matter, Respondent contends that the children will be placed in grave risk if they return to Norway because Petitioner allegedly abused her in front of the children throughout their marriage. (R. Decl. ¶¶ 30–47.) In particular, Respondent details one incident in which, after Petitioner "refused to help" with the children, Respondent threatened to throw Petitioner's computer out the window and Petitioner "struck [her] across the face with his hand, knocking [her] to the ground" in front of the children, who were four and two years old at the time. (*Id.* ¶¶ 38–39.) Indeed, Dr. Rahtz testified that the children "experienced trauma" as a result of the "domestic violence incident" and "exposure to extended emotional and verbal putdowns and condemnation and belittling of [Respondent] by Petitioner." (Tr. at 170:2–7.)

Petitioner denies abusing Respondent throughout their marriage and describes the one altercation detailed by Respondent differently. (*See* Rebuttal Decl. of Per Magne Eidem, dated Oct. 2, 2018 ("Rebut. Decl.") ¶ 28.) According to Petitioner, Respondent "became very mad" when she found out he was smoking cigarettes behind her back and "it was she who started to slap [him] in the face in front of the children so hard, [his] glasses flew off [his] face." (*Id.*) Petitioner then "pushed her in the shoulder with a flat hand" and "she did not fall." (*Id.*)

Regardless of whose version of the altercation is closer to the truth, the parties are now divorced and would not be residing together under any circumstances. Thus, the likelihood of future physical alterations between them is remote. Furthermore, there is simply no evidence to

suggest that Petitioner has ever abused the children, or that he will ever do so. (*See* Tr. at 241:18–20.) Accordingly, the Court finds no basis to conclude that the children would be placed in grave danger if they were returned to Petitioner's custody.

Finally, Respondent argues that the children will be exposed to grave risk if they are taken away from the network of doctors overseeing their care in the United States. The Court is, and has been, sensitive to this concern. In particular, the Court has closely monitored T.E.'s medical condition as he has undergone multiple surgeries since the hearing held on October 9, 2018. (*See* Doc. Nos 73, 76, 78, 81, 85, 87.) In light of the completion of those surgeries and T.E.'s present ability to travel, the Court concludes that the children will not be exposed to a grave risk of harm if they are returned to Norway after the completion of the school year.

As noted above, T.E. underwent a successful pull-through surgery on November 30, 2018; a follow-up operation and examination on January 23, 2019; a successful ileostomy closure on March 19, 2019; and an exploratory operation, as a result of a post-surgery illness, on March 26, 2019. (*See* Doc. Nos. 82, 90 at 3.) On April 16, 2019, Dr. Fisher stated that T.E. had been discharged from the hospital after his last operation and that he was "physically safe to travel by any means," although he will still require daily rectal irrigations for several months or years. (Doc. No. 94 at 3–4.) Petitioner has submitted a declaration stating that he is learning to administer the daily treatment identified by Dr. Fisher, and that he will be prepared to access such treatment at St. Olav's Hospital in Trondheim if T.E. is returned to Norway. (Doc. No. 95 at 1–2.) Petitioner has also submitted a letter from Dr. Drivenes of St. Olav's Hospital, who "confirm[s] that" T.E. "will receive adequate medical care" in Norway. (Doc. No. 95-1 at 3.) Furthermore, the medical team at St. Olav's can supervise T.E.'s treatment in consultation with Dr. Kristin Bjørnland (*id.* ¶ 16), "a renowned and experienced pediatric surgeon and professor of

gastroenterology and pediatric surgery at the University of Oslo." (Pall Decl. ¶ 38.)

While providing the Court with thorough and helpful updates regarding T.E.'s condition, Dr. Fisher has also opined that doctors in Norway did not perform T.E.'s first pull-through surgery properly when he was an infant and that Dr. Fisher and his team are particularly well-suited to manage T.E.'s condition going forward. (Doc. Nos. 82 at 2–3, 94 at 3–4.) The Court does not dispute the skills of Dr. Fisher or his finding that surgeons in Norway inadequately performed T.E.'s first pull-through operation in 2008. Nevertheless, the narrow question before the Court is not whether Dr. Fisher and his team are best suited to manage T.E.'s condition, but whether access to medical care in Norway is so lacking as to pose a grave risk to T.E.'s health. There is no evidence, let alone clear and convincing evidence, that T.E. would receive inadequate medical care in Norway upon his return. *See* 22 U.S.C. § 9003(e)(2)(A). Thus, the Court is satisfied that T.E. will not be placed at grave risk of physical harm when he returns to Norway.

In addition to T.E.'s Hirschprung's disease, both children suffer from "longstanding, multiple, and severe psychiatric conditions." (Rahtz Decl. ¶ 140.) Specifically, T.E. suffers from "ADHD, DMDD, Trichotillomania, Anxiety Disorder, and Depressive Disorder[,]" and N.E. suffers from "ADHD, DMDD, Mood Disorder, and Learning Disorder." (*Id.* ¶¶ 143, 145.) "[E]ach child requires highly specialized mental health care and educational placement, designed to address each child's specific and multiple needs." (*Id.* ¶ 140.) In his declaration, Dr. Rahtz concludes that, if the children were to be "removed from their current support and care network . . . [they] will likely face a significant regression in their development and in their psychological and behavioral symptom picture." (*Id.* ¶ 169.) This conclusion was solely based on the fact that the children's current treatment "would be disrupted." (Tr. at 148:1–4.) That is, Dr. Rahtz did not suggest that the children would be unable to receive comparable psychological care in

13

Norway, but only that disrupting their current treatment regimen could cause problems. (*Id.*) In other words, "added stressors . . . especially including changes in environment, schools, [and] treatment providers" could cause, with "a near-certainty[,] . . . their relapsing and regressing to states of increased symptomatology which would set back their progress and development enormously, and make further progress in their treatments and educations immensely more difficult." (Rahtz Decl. ¶ 141.)

While the Court credits Dr. Rahtz's conclusion that any disruption of the children's mental health treatment would be suboptimal, the Court notes that the children had to undergo a similar disruption when Respondent first pulled them out of their mental health treatment programs in Norway and took them to the United States. Indeed, there is reason to believe that a return to Norway – where the children lived for the first eight and six years of their lives, and where the vast majority of their family resides – would be less traumatic than the original trip to the United States. (*See* Rahtz Decl. ¶ 141 (noting that changes in "cultural mores" and "language" are additional "stressors" that could be deleterious to the children's mental health).) It also bears repeating that Respondent's decision to needlessly drag the children to court proceedings may have exacerbated the children's stress. Therefore, although the Court acknowledges that an abrupt termination of the children's current mental health treatment could pose some danger to their well-being, the Court concludes that such danger will be sufficiently mitigated if the children are moved after the conclusion of the school year. This will allow for a more orderly and gradual transition from the children's "special educational placement[s] in . . . specialized program[s]" during the summer months between school years. (Tr. at 146:7–8.) Petitioner has already been in contact with schools in both Trondheim and Elnesvågen, and Petitioner – and Respondent, if she chooses to return to Norway – can work together with the

14

schools in either location to create specially tailored programs to assist in the children's transition back to Norway, thereby addressing their mental health needs. (*See* Doc. No. 72 ¶¶ 9–11, 17–18.)

### III. CONCLUSION

This is a difficult case. The Court has no reason to doubt that both Petitioner and Respondent care deeply for their children and want what is best for them. Nonetheless, the Hague Convention prevents one parent from unilaterally removing children from their State of habitual residence without regard to the other parent's rights. To the extent that there are disagreements between the parties about custody, visitation, and care, those disagreements must be resolved in the family courts of Norway, which are no doubt up to the task. For the purposes of *this* proceeding, however, the Court's inquiry is a limited one, and there can be little doubt that Petitioner has met his burden under ICARA.

For the foregoing reasons, IT IS HEREBY ORDERED THAT the Petition is GRANTED, and Respondent shall return the children to Norway no later than June 29, 2019.[3] The Clerk of Court is respectfully directed to mail a copy of this Opinion and Order to Respondent, enter judgment in favor of Petitioner, and close this case.

SO ORDERED.

Dated:   April 29, 2019
         New York, New York

                                    _____
                                    RICHARD J. SULLIVAN
                                    UNITED STATES CIRCUIT JUDGE
                                    Sitting by Designation

---

[3] Petitioner requests that the Court "order Respondent to sign whatever forms are necessary" to obtain medical records from Dr. Fisher in advance of the children's return to Norway. (Doc. No. 96 at 3.) The Court denies Petitioner's request at this time because there is no indication that Respondent would refuse to sign the forms at issue. Of course, the Court expects that the parties will take all necessary steps to comply with this order and facilitate the children's transition back to Norway as expeditiously as possible.